# UNITED STATES DISTRICT COURT

for the
District of South Dakota
Western Division

| | |
|---|---|
| In the Matter of the Search of: | ) |
| | ) Case No. 5:20-mj-74 |
| Seven Cellular Phones, as described in | ) |
| Attachment A. | ) |
| | ) |
| | ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Seven Cellular Phones, as described in **ATTACHMENT A**, which is attached to and incorporated in this Application and Affidavit

located in the District of _____ South Dakota _____, there is now concealed *(identify the person or describe the property to be seized)*:

See **ATTACHMENT B**, which is attached to and incorporated in this Application and Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;
☒ contraband, fruits of crime, or other items illegally possessed;
☒ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) and 846 | Conspiracy to Distribute Controlled Substance |
| 18 U.S.C. § 922(g) | Prohibited Person in Possession of Firearms |

The application is based on these facts:

**X** Continued on the attached affidavit, which is incorporated by reference.

☐ Your applicant requests authorization to serve the search warrant any time day or night pursuant to Fed. R. Crim. P. 41(e)(2)(A)(ii), the basis of which is set forth in the attached affidavit.

_____
*Applicant's signature*

Kathryn N. Rich, AUSA
*Printed name and title*

Sworn to before me and: ☐ signed in my presence.
☒ submitted, attested to, and acknowledged by reliable electronic means.

Date: April 1, 2020

_____
*Judge's signature*

City and state: _ Rapid City, SD _

_____ Daneta Wollmann, U.S. Magistrate _____
*Printed name and title*

## ATTACHMENT A

### Property to Be Searched

All devices are currently in custody of South Dakota Division of Criminal Investigation.

- Item# 19-217667-018 identified as Skinner's cell phone (found in center console of Skinner's vehicle on December 11, 2019, pursuant to search warrant 5:19-mj-145)
- Item#19-217665-020 identified as Jesse Stewart's cell phone (Found on his person on December 11, 2019 at EconoLodge, Room 326)
- Item#19-217665-040 identified as Edward Martin's cell phone (Found in shoebox by door of EconoLodge Room 326 on December 11, 2019, pursuant to search warrant 5:19-mj-145)
- Item#19-217665-042 identified as Edward Martin's cell phone (Found in shoebox by door of EconoLodge Room 326on December 11, 2019, pursuant to search warrant 5:19-mj-145)

From the search warrant execution in Las Vegas:

- Black Cricket cell phone belonging to Kirbesha Bailey, has sunflower popsocket on back of phone, found on January 28, 2020, pursuant to search warrant 20-26
- Black UMX cell phone, believed to belong to Christopher James, found in spare bedroom where Gidden staying on January 28, 2020, pursuant to search warrant 20-26)
- Silver Apple iPhone, belonging to Kirbesha's juvenile son, on January 28, 2020, pursuant to search warrant 20-26)

## **ATTACHMENT B**

### **Particular Things to be Seized**

1- Records and information, electronic mail messages, text messages, browser history, "bookmarked or favorite" web pages, search terms that the user entered into any internet search engine as well as any deleted data, receipts, notes, ledgers, and other information relating to the possession, sale and transfer of controlled substances or firearms.

2- Electronic media in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or any other media that can store data) relating to the possession, sale and transfer of controlled substances or firearms. Including, but not limited to:

    a. All contact information, names, aliases, and telephone numbers stored in the phone, including any telephone number directory stored in the memory of the phone;

    b. All telephone calls made, missed, or received that are stored in the memory of the phone;

    c. All text messages sent or received, or made but not sent, that are stored in the memory of the phone;

    d. All messages or images sent or received, or made but not sent, that are viewable or stored in an application on the phone;

    e. The content of any and all voicemail messages;

    f. All images, photographs, and videos, sent or received, that are stored in the memory of the phone; and

    g. Any and all records, showing dominion, ownership, custody, or control over the phone.

2

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: Seven Cellular Phones, as further described in Attachment A. | Case No. 5:20-mj-74 |
| | AFFIDAVIT IN SUPPORT OF APPLICATION FOR A SEARCH WARRANT |

STATE OF SOUTH DAKOTA  )
                        )
COUNTY OF PENNINGTON    )

I, BJ George, Special Agent with South Dakota Division of Criminal Investigation (DCI), being duly sworn, deposes and states under penalty of perjury that the following is true to the best of my information, knowledge and belief.

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the South Dakota Division of Criminal Investigation (DCI), in Rapid City, South Dakota. I have held this position since November 2014. Before joining DCI, I was employed by the Pennington County Sheriff's Office beginning in January 2004. I was a patrol officer for four years before being assigned to the Investigations Division in March 2008. I have investigated a variety of crimes, including homicide and theft. I was assigned to the Unified Narcotics Enforcement Team (UNET) in 2010 and continued that assignment after I joined DCI. As a member of UNET, it is my responsibility to investigate the use, transportation, distribution, and manufacture of illegal drugs. Since my tenure with UNET I have been involved in numerous drug investigations. I have interviewed many drug users and dealers regarding the manner in which they conduct business and have become familiar with their techniques. I have received specialized training in all of these categories from DCI, the Drug Enforcement Agency (DEA), and other law enforcement agencies regarding drug trafficking.

2. I make this affidavit in support of an application for a search warrant for Subject Devices listed in Attachment A, which are currently in the custody of DCI. The

devices and information to be searched is described in the following paragraphs and in Attachments A and B.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training, experience and the facts as set forth in this affidavit, there is probable cause to believe that evidence of violations of 18 U.S.C. § 922(g)(1), Possession of Firearm by a Prohibited Person, and 21 U.S.C. §§ 846 and 841(a), Conspiracy to Distribute a Controlled Substance, are present in the Subject Devices, as further described in Attachment A.   There is also probable cause to search the information described in Attachment A for evidence, contraband, or fruits of these crimes, as further described in Attachment B.

### FACTS IN SUPPORT OF PROBABLE CAUSE

5.      Beginning in September 2019, a DCI Confidential Informant (CI) (CI #19-4042) identified an individual, later identified by law enforcement as Edward Lamont MARTIN, as the CI's source of methamphetamine.   Prior to being signed up as a CI, the CI had been stopped by law enforcement and found in possession of methamphetamine and drug paraphernalia.   The CI has a criminal history including felony convictions. The CI provided MARTIN's cell phone number to be (605) 646-8712.   The CI also provided MARTIN's physical address to be 722 Myrtle Avenue, Rapid City, SD.   The CI stated that MARTIN had been sourcing the CI with methamphetamine for approximately four (4) to five (5) months.    MARTIN has provided the CI with ¼ pound quantities of methamphetamine on four (4) separate occasions, as well as multiple ounces quantities of methamphetamine, single ounce quantities of methamphetamine, and ½ ounce quantities of methamphetamine throughout the time MARTIN has sourced the CI with methamphetamine.

6.      The CI provided SD DCI Special Agent BJ George with a cell phone that contained a photograph of MARTIN's Nevada identification card that the CI had stored on the cell phone.   The CI provided SA George with access to the cell phone in order

for SA George to retrieve the photograph of MARTIN's driver's license. The CI also identified an incident in which MARTIN provided the CI with a 'MAC-10' firearm. The CI stated that MARTIN did not want to be found in possession of the firearm by law enforcement. The CI provided that the 'MAC-10' was being stored at a residence near Sturgis, SD. It should be noted that on September 3, 2019, law enforcement, with the assistance of the CI, recovered the 'MAC-10' that the CI identified was provided to the CI by MARTIN.

7.   On September 3, 2019, SA George met with the CI (CI #19-4042). At that time, the CI indicated that the CI was able to purchase two (2) ounces of methamphetamine from MARTIN. SA George advised the CI to arrange the controlled purchase of methamphetamine from MARTIN. On this date, the CI met with MARTIN at the residence located at 722 Myrtle Avenue, Rapid City, SD. A female, identified by law enforcement as Sara SKINNER, was also present at the residence. A red Ford Escape bearing South Dakota license plate number 2V7098 was parked on the street directly in front of the above identified address. SKINNER is the registered owner of the red Ford Escape bearing South Dakota license plate number 2V7098. Further, it was known to law enforcement that SKINNER has a history of possessing/use of a controlled substance (methamphetamine).

8.   On September 3, 2019, the CI and MARTIN travelled in the CI's vehicle and followed SKINNER, who drove the red Ford Escape referenced above, to a residence located at 340 St. Andrew Street, Rapid City, SD. It should be noted that the Unified Narcotics Enforcement Team (UNET) executed a State of South Dakota search warrant at the residence located at 340 St. Andrew Street, Rapid City, SD regarding the use and distribution of heroin. Upon arrival at the residence, the CI and MARTIN waited in the CI's vehicle as SKINNER entered the residence. While waiting in the CI's vehicle, MARTIN informed the CI that MARTIN was getting one (1) pound of methamphetamine shipped to MARTIN and was expected to receive the package containing the methamphetamine on Thursday (September 5) or Friday (September 6). MARTIN informed the CI that the CI was able to purchase one (1) ounce of methamphetamine for $675.00; ¼ pound of methamphetamine for $2,700.00; or ½ pound of

methamphetamine for $5,400.00. MARTIN also informed the CI that MARTIN was aware of an individual attempting to sell semi-automatic rifles.

9.   When SKINNER departed the residence located at 340 St. Andrew Street, Rapid City, SD, it was determined that SKINNER was not able to provide the CI with the two (2) ounces of methamphetamine. At the time, MARTIN contacted an unknown individual via cell phone. It was then determined that MARTIN and the CI would return to 722 Myrtle Avenue, Rapid City, SD and a separate source of methamphetamine would be meeting at MARTIN's residence. When MARTIN and the CI arrived at 722 Myrtle Avenue, Rapid City, SD, law enforcement assisting with the controlled purchase operation observed two (2) Native American males exit a black Pontiac passenger car bearing South Dakota license plate number 2V9061. MARTIN and the two (2) unknown Native American males entered the residence at 722 Myrtle Avenue. Ultimately, the CI also entered the residence. MARTIN, the CI, and the unknown males entered a bedroom, which was identified by the CI as MARTIN's bedroom. The CI stated that MARTIN and the unknown males were weighing methamphetamine and instructed the CI to obtain baggies and weigh out two (2) ounces of methamphetamine, which the CI agreed to do. The CI provided MARTIN with documented agent cashier funds utilized to purchase illegal drugs and other contraband. The CI then departed the residence and travelled to a pre-determined location where the suspected methamphetamine was provided to SA George. The suspected methamphetamine was field tested and was presumptive positive for methamphetamine.

10.   Once the CI departed the residence, law enforcement assisting with the controlled purchase operation observed the two (2) unknown Native American males exit 722 Myrtle Avenue and enter 724 Myrtle Avenue. It should also be noted that following the controlled purchase on September 3, 2019, MARTIN contacted the CI via cell phone, which was not audio recorded. At that time, MARTIN informed the CI that the individual attempting to sell firearms had one AR-style firearm that the CI was able to purchase for $1,200.00. MARTIN informed the CI that the individual attempting to sell firearms is employed and would be available on the evening of September 4, 2019.

11.   On September 3, 2019, members of UNET, ATF, and the Rapid City POD utilized a CI to conduct a controlled crystal methamphetamine purchase from Edward

4

MARTIN. During the controlled purchase, and in the presence of the CI, MARTIN placed an outgoing telephone call to his "cousin" regarding the anticipated delivery date of a parcel containing an unspecified amount of crystal methamphetamine. The call placed by MARTIN occurred at approximately 5:39pm. An administrative subpoena and subsequent analysis of MARTIN's tolls revealed that MARTIN had communicated with telephone number (909) 470-0514 on the aforementioned date and time. Additionally, tolls suggested that MARTIN frequently communicated with telephone number (909) 470-0514, averaging approximately 204 calls/text messages between September and October 2019.

12. An administrative subpoena submitted to T-Mobile subsequently revealed that telephone number (909) 470-0514 is associated with a Christopher L. JAMES with an address of 6500 W. Charleston Boulevard, Apartment 128, in Las Vegas, Nevada.

13. On September 4, 2019, SA George and Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) SA Riley Cook met with the CI regarding a potential controlled purchase of firearms, which would be facilitated by MARTIN. On this date, the CI travelled to MARTIN's residence located at 722 Myrtle Avenue, Rapid City, SD. The CI made contact with MARTIN at which time MARTIN discussed supplying the CI ½ pound of methamphetamine in exchange for $5,400.00 and then providing the CI with an additional three (3) ounces of methamphetamine for $700.00. MARTIN informed the CI that the methamphetamine was shipped and would be received by MARTIN on Friday, September 6, 2019.

14. MARTIN informed the CI that the individual in possession of the firearms and attempting to sell firearms lived across the street from MARTIN. During a phone call with the individual, MARTIN referenced the source of the firearms as 'Keeler.' It was identified that Keeler STANDS resides at 723 Myrtle Avenue, Apartment #1, Rapid City, SD. MARTIN instructed the CI to return to MARTIN's residence later in the evening to purchase firearms.

15. On September 4, 2019, SA George and SA Cook met with the CI (CI #19-4042). The CI had arranged a controlled purchase of firearms facilitated by MARTIN. It was suspected STANDS was in possession of the firearms. The CI travelled to MARTIN's residence and made contact with MARTIN. The CI entered MARTIN's

residence and made contact with 'Sara,' identified by the CI as Sara SKINNER.  While the CI was at MARTIN's residence and waiting for STANDS arrival, SKINNER contacted STANDS via cell phone and requested STANDS travel to the residence in order to complete the controlled purchase of firearms.

16.  After an extended period of time, STANDS arrived at MARTIN's residence travelling in a blue sedan bearing South Dakota license plate number 2U3907.  The CI made contact with two (2) individuals that exited the blue sedan.  STANDS was identified by the CI as one of the individuals who arrived in the blue sedan.  STANDS also indicated that he may reside across the street from MARTIN.  STANDS and the unidentified male produced two (2) firearms, later identified as a DPMS, model A-15, 5.56 caliber semi-automatic rifle (SN: DKF910340) and an Aero Precision, model SA 15, 5.56 caliber semi-automatic pistol (SN: JT015684).  The CI then purchased both firearms for $1,200.00; however, it should be noted that it was agreed by STANDS to provide MARTIN with $200.00 for facilitating the controlled purchase of the firearms. The CI then provided MARTIN with $200.00 of documented agent cashier funds.  The CI later identified that MARTIN provided SKINNER with $100.00 from the documented agent cashier funds provided to MARTIN.  Therefore, at the time of the controlled purchase, STANDS received $1,000.00 and MARTIN received $200.00 of documented agent cashier funds from the CI.  It should also be noted that the unidentified male indicated that a shotgun may also be available for purchase.  In addition, STANDS also informed the CI that STANDS had methamphetamine being transported and was currently near Scottsbluff, Nebraska.  STANDS indicated that he may be able to provide the CI with methamphetamine.

17.  On September 7, 2019, CI #19-4042 contacted SA George and advised that MARTIN had contacted the CI and indicated that the package containing the suspected methamphetamine was to be delivered on this date.  Based on MARTIN's statement, it is believed he or someone associated with him was tracking the package.  Law enforcement assisting with the investigation established surveillance of the MARTIN's residence located at 722 Myrtle Avenue, Rapid City, SD.  While conducting surveillance, law enforcement observed an employee with the United States Postal Service (USPS) place a package on the ground in front of 722 Myrtle Avenue, Rapid

City, SD. Shortly thereafter, MARTIN advised the CI that the CI was able to purchase methamphetamine from MARTIN. The CI was advised to arrange the controlled purchase of methamphetamine from MARTIN.

18. On September 7, 2019, the CI travelled to 722 Myrtle Avenue, Rapid City, SD. Upon arrival, the CI made contact with MARTIN and SKINNER. The CI conducted a controlled purchase of approximately ½ pound of suspected methamphetamine from MARTIN. Prior to the CI's departure from MARTIN's residence, MARTIN asked the CI if the CI would send money, via Walmart, to MARTIN's 'cousin' in Las Vegas, NV. Ultimately, the CI provided SA George three (3) bags containing a hard-crystal substance, which field-tested positive for methamphetamine.

19. On September 16, 2019, SA George was contacted by CI #19-4042 and informed that STANDS was in possession of a shotgun and the CI was able to purchase the firearm from STANDS. In addition, the CI was able to purchase four (4) ounces of methamphetamine from STANDS. The CI was advised to arrange the purchase of the firearm and methamphetamine from STANDS. The CI was to meet with STANDS at STANDS' residence located at 723 Myrtle Avenue, Rapid City, SD. The CI was advised to arrange a controlled purchase of the firearm and methamphetamine from STANDS.

20. On September 16, 2019, the CI travelled to STANDS' residence located at 723 Myrtle Avenue, Apartment #1, Rapid City, SD. Prior to the CI's arrival at STANDS' residence, law enforcement assisting with the controlled purchase operation observed MARTIN walk from STANDS' residence to MARTIN's residence located at 722 Myrtle Avenue, Rapid City, SD. Upon the CI's arrival at STANDS' residence, the CI makes contact with STANDS outside of the residence. It was determined to complete the controlled purchase of the firearm in the CI's vehicle. STANDS indicated that the four (4) ounces of methamphetamine originally discussed was not available. STANDS stated that the source of supply for the methamphetamine was his "sister's guy."

21. The CI completed the controlled purchase of a Mossberg, model 500A, 12 gauge pump-action shotgun (SN: K960852) from STANDS. The CI provided STANDS with $500.00 of pre-recorded AC funds in exchange for the firearm. STANDS would not reduce the price of the firearm; however, STANDS agreed to reduce the price of the methamphetamine when it became available for the CI to purchase. The CI requested

information regarding the AR-10 that STANDS had discussed in previous conversations with the CI. STANDS stated that the owner of the AR-10 informed STANDS that the firearm was valued at $3,500.00; however, the firearm could be purchased by the CI for one-half or one-quarter of the value of the firearm. STANDS stated that he would ask for an additional $200.00 from the CI for facilitating the purchase of the AR-10. STANDS stated that the AR-10 is bolt-action. The CI requested that STANDS send the CI a picture of the AR-10. STANDS did provide the CI with a digital photograph of the AR-10. STANDS also informed the CI that STANDS was able to sell the CI an additional pump-action shotgun for $125.00. STANDS exited the CI's vehicle and entered 723 Myrtle Avenue, Apartment #1, Rapid City, SD.

22.   Following the controlled purchase of the Mossberg, model 500A, 12 gauge pump-action shotgun (SN: K960852) from STANDS, the CI went to MARTIN's residence located at 722 Myrtle Avenue. The CI made contact with MARTIN while waiting to see if STANDS was able to obtain the originally agreed upon methamphetamine. While speaking with MARTIN, MARTIN informed the CI that MARTIN needed to wire money to MARTIN's cousin as soon as possible. MARTIN informed the CI that the money needed to be wired to 'Christopher James' in Las Vegas, NV. The money needed to be sent in order for MARTIN to receive methamphetamine. The CI agreed to assist MARTIN in sending a money transfer from Walmart. Shortly thereafter, the CI contacted STANDS and was informed that the methamphetamine was not available for purchase on this date. STANDS did state that the CI would be able to purchase four (4) ounces of methamphetamine on September 17, 2019 for $500.00 less.

23.   During the controlled meeting, MARTIN communicated with an unknown individual on three (3) occasions discussing the funds that were to be sent. Calls made/received by MARTIN occurred at approximately 4:43pm, 5:20pm, and 5:27pm. An administrative subpoena submitted to Verizon wireless, requesting subscriber and toll information for a cellular telephone number associated with Edward MARTIN, subsequently revealed that MARTIN respectively communicated with Christopher JAMES on two (2) occasions, and a Kirby Bailey on one (1).

24.   At this time, the CI interviewed and utilized has been proven credible.

25.     An administrative subpoena was subsequently submitted to Walmart requesting any/all money wires made by Edward MARTIN from January 1, 2019, to the present. On October 11, 2019, Walmart complied with the subpoena and provided all requested records. An analysis of documents received revealed that MARTIN had wired funds to various individuals residing in California and Nevada, to include Christopher JAMES and a female by the name of Kirbesha BAILEY, who utilized an address of 6500 W. Charleston Boulevard, Apartment 128, in Las Vegas, Nevada, on several occasions. Investigators were able to confirm BAILEY's home address via an administrative subpoena to Cox Communications.

26.     On September 17, 2019, MARTIN informed the CI that if MARTIN was able to transfer the money to MARTIN's cousin, MARTIN would be receiving methamphetamine which could be purchased by the CI.   The CI then travelled to Walmart located at 1200 N. Lacrosse Street, Rapid City, SD with MARTIN.   The CI agreed to transfer the money for MARTIN and MARTIN provided the CI with $200.00 to be transferred to 'Christopher James' in Las Vegas, NV.   The CI entered Walmart and completed the transfer.   As MARTIN and the CI travelled back to MARTIN's residence, the CI and MARTIN further discussed the cost and quantities of methamphetamine that the CI was able to purchase from MARTIN. The Mossberg, model 500A, 12 gauge pump-action shotgun (SN: K960852) was ultimately provided to ATF SA Cook.   It should be noted that it was identified that 'Christopher James' resides at 6500 West Charleston Boulevard, Apartment 128, Las Vegas, NV 89146.   Further, throughout the investigation, it was determined that multiple packages have been sent via the United Parcel Service (UPS) from Christopher James or known associates to MARTIN or known associates.

27.     On September 17, 2019, CI #19-4042 contacted DCI SA George and advised that the CI was able to purchase ¼ pound of methamphetamine from STANDS. The controlled purchase of the suspected methamphetamine was initially agreed to occur on September 16, 2019.   The CI was advised to arrange to purchase the suspected methamphetamine from STANDS.   Ultimately, it was determined that STANDS and the CI would travel to Sturgis, SD in order to complete the controlled purchase of

methamphetamine.  The CI met with STANDS at STANDS' residence located at 723 Myrtle Avenue, Apartment #1, Rapid City, SD prior to departing to Sturgis, SD.

28.   Pursuant to the investigation and information gathered by law enforcement assisting with the controlled purchase, it was determined that a black KIA with paper plates was involved with the distribution of methamphetamine with STANDS.  While the CI and STANDS travelled to Sturgis, SD, it was determined that the controlled purchase of methamphetamine would occur in the McDonald's parking lot in Sturgis. Based on information gathered throughout the controlled purchase, it was believed that the driver of the black KIA with paper plates was Tyler OLSON.  STANDS stated that OLSON's brother, believed to be Mason Olson, was convicted of a conspiracy charge and currently incarcerated in Federal prison.  STANDS identified the last name of the individual who is obtaining the methamphetamine on this date as 'OLSON.' STANDS discussed receiving cash from the CI for facilitating the controlled purchase from OLSON.

29.   Upon arrival at McDonald's, STANDS discussed entering OSLON's vehicle when it arrived to obtain the methamphetamine and provide the methamphetamine to the CI.  STANDS also discussed facilitating a robbery on an unknown individual.  It should be noted that while the CI and STANDS are waiting for OLSON to arrive at McDonald's, surveillance units observed the KIA sedan at a residence in Sturgis, SD. Shortly thereafter, the KIA arrived at McDonald's.

30.   Upon arrival, the driver of the KIA, identified as Tyler OLSON, made contact with the CI.   The CI entered OLSON's vehicle.   The CI provided OLSON with documented agent cashier funds in exchange for approximately four (4) ounces of suspected methamphetamine.   OLSON informed the CI that OLSON's brother is currently incarcerated in federal prison for a five-hundred (500) gram conspiracy. OLSON informed the CI that the CI needs to continue going through STANDS in order to purchase methamphetamine from OLSON.  The CI and OLSON discuss the CI purchasing marijuana from OLSON.  OLSON indicated that he was able to provide the CI with half-pound and full-pound quantities of methamphetamine.  Following the controlled purchase of methamphetamine from OLSON and STANDS, SA Cook and SA

George met with the CI and retrieved the suspected methamphetamine, which field tested positive for methamphetamine.

31. On September 19, 2019, SD DCI SA BJ George was contacted by CI #19-4042 and advised that MARTIN was in possession of a large quantity of methamphetamine. The CI further stated that the CI was able to purchase ½ pound of methamphetamine from MARTIN. SA George advised the CI to arrange a controlled purchase of methamphetamine from MARTIN. On this date, a controlled purchase of methamphetamine occurred from MARTIN in the parking lot of Jackpot Casino, Rapid City, SD. The CI purchased ½ pound of methamphetamine from MARTIN in exchange for documented agent cashier funds. Following the controlled purchase, the CI met with law enforcement and provided the suspected methamphetamine to DCI SA George. The suspected methamphetamine field-tested positive for methamphetamine.

32. On October 4, 2019, the Rapid City Police Department (RCPD) initiated a traffic stop with a black KIA with paper plates (dealer tag). The vehicle did not stop and accelerated at a high rate of speed. RCPD initiated a vehicle pursuit. Ultimately, the KIA maneuvered to avoid a crash with an uninvolved third-party vehicle and struck a curb. The passenger of the vehicle was immediately taken into custody. The driver of the vehicle, identified as Tyler OLSON, ran from the vehicle. OLSON's name was on the paper plates (dealer tag) located on the vehicle. RCPD utilized a K-9 to track and located OLSON, who was hiding under a semi-truck in a nearby parking lot.

33. When law enforcement approached the KIA, a firearm was observed near the driver's seat. The firearm was later identified as a Smith and Wesson, model 15-4, .38 caliber revolver (SN: 93K2660). A search incident to arrest was conducted of OLSON. At that time, a plastic container containing multiple jeweler bags were located on his person. The baggies located on OLSON's person field-tested positive for methamphetamine. A purple jeweler bag was located in the passenger compartment of the vehicle that contained a white crystal substance which field-tested positive for methamphetamine.

34. On October 5, 2019, RCPD were dispatched to a disturbance call in Rapid City, SD. Upon arrival, law enforcement observed a gray Ford F-150 bearing South Dakota license plate number 2J1472 departing from near the suspected location of the

disturbance.  A traffic stop of the vehicle was initiated.  While approaching the vehicle, a RCPD Officer Holbrook heard a noise from the vehicle that he described was similar to the discharge of a starter's gun.  RCPD made contact with the occupants of the vehicle.  The driver was identified as Chase MCGUIRE and the passenger was identified as Keeler STANDS.  While law enforcement was talking with STANDS and MCGUIRE, STANDS admitted to have unintentionally discharged a 9mm caliber pistol while attempting to disassemble the firearm.  STANDS identified that the firearm was then placed under the passenger seat.  STANDS stated that the round that was discharged was a blank.  STANDS stated that he commonly loads the first round with a blank to serve as a "warning shot."

35.  Pursuant to the investigation, MCGUIRE provided law enforcement consent to search the vehicle.  MCGUIRE further provided that he was currently on Probation with the State of South Dakota.  During the search of the vehicle, the 9mm semi-automatic pistol that STANDS had discharged and dissembled was located and collected as evidence.  Law enforcement also located in the passenger compartment of the vehicle a jewelry bag containing a white reside that field-tested positive for methamphetamine.  In the bed of the pickup, law enforcement identified a black backpack.  A gallon-sized plastic baggie was located in the backpack, which contained approximately fifteen (15) ounces of suspected methamphetamine.  Also located in the bed of the pickup was a black nylon case containing .223 caliber semi-automatic rifle.  Both MCGUIRE and STANDS were in possession of a large quantity of U.S. currency.  The items collected as evidence were placed in the RCPD evidence facility.

36. On October 5, 2019, ATF SA Cook and DCI SA George conducted an interview with STANDS following the traffic stop and contact with RCPD.  STANDS stated that MCGUIRE advised STANDS to run from law enforcement when contact was initially made by RCPD.  STANDS stated that MCGUIRE was on probation and did not want STANDS to be in the vehicle while possessing a firearm.  STANDS stated that he was in possession of a firearm, which was discharged when STANDS attempted to disassemble the firearm, at the time RCPD initially made contact with the STANDS and MCGUIRE.  STANDS stated that the round that was discharged was a blank cartridge.  STANDS advised that he possessed the firearm for protection.  STANDS also stated he

has been arrested and convicted of a felony, but received a Suspended Execution of Sentence.

37.   SA George advised STANDS that a large quantity of methamphetamine and a rifle were located in the back of the vehicle MCGUIRE and STANDS were occupying. STANDS stated that he was not aware of the methamphetamine in the vehicle. However, STANDS stated that STANDS had plans to shoot the rifle located in the vehicle and possibly purchase the firearm.  STANDS stated that he was not aware that the firearm had been placed in MCGUIRE's vehicle.  STANDS described the rifle that was located in the vehicle.  STANDS stated that the firearm was available to be purchased for $1,000.00.  STANDS stated that he last utilized methamphetamine approximately two (2) or three (3) days prior to the interview.

38.   STANDS again stated that the methamphetamine located in the vehicle did not belong to STANDS.  STANDS indicated that MCGUIRE may have arrived at the residence with the methamphetamine because STANDS did not observe any methamphetamine in the residence.   SA George informed STANDS that law enforcement may be aware of STANDS' involvement with illegal activities. STANDS stated that he previously associated with Mason OLSON, who is currently in Federal prison for drug offenses.  STANDS stated that he does have a history of using and selling methamphetamine.  STANDS stated that he has also facilitated the sale of methamphetamine in the past.   STANDS initially stated that he has not been associated with the sale of firearms in the recent past; however, STANDS then stated he may have been associated with the sale of firearms.

39.   STANDS stated that he and MCGUIRE have gone through approximately one-half (1/2) pound of methamphetamine in the past two days.  STANDS estimated that there was approximately 209 grams of methamphetamine in the baggie located in the vehicle occupied by STANDS and MCGUIRE.   STANDS stated that the methamphetamine in the vehicle belonged to MCGUIRE.   STANDS stated that MCGUIRE has requested STANDS and MCGUIRE purchase a pound of methamphetamine together for further distribution.

40.   STANDS stated that Sara, who lives across the street and known to law enforcement to be Sara SKINNER, has sold STANDS methamphetamine in the recent

past. STANDS stated that he has purchased a total of approximately one (1) pound of methamphetamine from SKINNER in the past month and a half. STANDS stated that SKINNER no longer resides on Myrtle Avenue and is currently staying in hotels in Rapid City, SD. It should be noted that pursuant to the investigation, law enforcement had identified that MARTIN and SKINNER were no longer residing at 722 Myrtle Avenue, Rapid City, SD and would frequent various hotels throughout Rapid City.

41. STANDS identified an individual known to STANDS as 'Bones,' who is known to law enforcement to be Edward MARTIN. STANDS has known MARTIN for approximately one (1) month. STANDS stated that MARTIN is a 13th Street Crip from Southern California. STANDS stated that he has received methamphetamine from MARTIN. STANDS stated that he has distributed ten (10) to fifteen (15) pounds of methamphetamine for MARTIN. STANDS stated that MARTIN is receiving methamphetamine through the mail. STANDS provided that MARTIN is going to receive six (6) more pounds of methamphetamine through the mail in the near future. STANDS indicated that he owes MARTIN $1,350.00 for methamphetamine. STANDS stated that MARTIN may be receiving methamphetamine from a source in Las Vegas, Nevada. STANDS identified multiple addresses in Rapid City, SD that MARTIN is having methamphetamine shipped. STANDS stated that approximately three (3) weeks prior to this interview, STANDS drove MARTIN to a residence on the west side of Rapid City, SD in order to pick up a package containing methamphetamine. STANDS stated that MARTIN has provided STANDS with a 9mm pistol in the recent past.

42. STANDS stated that Tyler OLSON provided STANDS with approximately six (6) ounces of methamphetamine approximately one week prior to this interview. STANDS stated that approximately one (1) week after OLSON was released from State prison, OLSON arrived at STANDS' residence with approximately one (1) pound of methamphetamine. STANDS stated that OLSON is driving a black 2020 KIA sedan.

43. On October 15, 2019, RCPD Detective Cade Bloomenrader conducted an interview with a Source of Information (SOI #1). At that time, SOI #1 reported involvement in making trips to pick up methamphetamine from out-of-state sources, and frequent drug use by smoking methamphetamine for the past several years. SOI #1 reported that he/she, as well as Carmen DILLON and Sara SKINNER, assisted a

male subject in the Rapid City area with the sale of methamphetamine. This man is nicknamed "Bones", known to law enforcement to be Edward Lamont MARTIN. SOI #1 reported that MARTIN came to Rapid City from California specifically for the purpose of selling drugs and has lived in Rapid City for approximately one (1) year.

44. The SOI #1 stated that MARTIN receives shipments of illegal drugs (methamphetamine) through the mail, typically FedEx or the United Postal Service (UPS). The packages are commonly addressed to DILLON and are kept at UPS or FedEx for pickup. The SOI stated that MARTIN does not drive, but commonly rides with SKINNER in a Ford Escape. The SOI advised that MARTIN has a storage unit, later identified to be located at 2280 Seger Drive, unit #281. SOI #1 stated that MARTIN stores methamphetamine in the storage unit. SOI #1 estimated that MARTIN travels with approximately one (1) pound of methamphetamine for distribution and leaves the remainder of MARTIN's methamphetamine in the storage unit.

45. SOI #1 stated that he/she has been assisting MARTIN in the distribution of methamphetamine for approximately two (2) months. SOI #1 estimated that he/she has received one (1) ounce of methamphetamine every other day from MARTIN, totaling approximately thirty-five (35) ounces of methamphetamine in the time SOI #1 has been dealing with MARTIN. SOI #1 estimated that both DILLON and SKINNER has also received similar quantities of methamphetamine from MARTIN. SOI #1 believed that SKINNER likely received more, because SKINNER is in a relationship with Bone, and SKINNER gets meth from MARTIN daily. SOI #1 stated that SKINNER resides at various hotels throughout Rapid City and will send money to MARTIN's source of methamphetamine.

46. On October 22, 2019, RCPD Detective Bloomenrader spoke with DCI CI #19-1576 (formerly referred to as SOI #1). The CI provided the location of a storage unit belonging to Edward Lamont MARTIN. The CI again reported that MARTIN has a storage unit at 2280 Seger Drive, Rapid City, SD. This property is secured with a gate, which can be accessed with a PIN, and the storage unit number is 285. CI verified this is the unit that Carmen DILLON gained access to, but belongs to MARTIN (likely registered to Sara SKINNER). The CI reported DILLON was recently in the Rosebud/Mission, SD area, selling methamphetamine. Once DILLON returns to Rapid

City, the CI expects DILLON to pick up a shipment via FedEx or UPS, which will be promptly taken to the storage unit.   MARTIN will keep a portion of the methamphetamine with him for sales and store the remainder in the unit.

47.  On October 25, 2019, an electronic video surveillance unit (EVSU) was set-up in order to observe the area of the storage units believed to be used by MARTIN and associates in order to store methamphetamine.   Throughout the investigation, SA George has monitored the EVSU.

48.  On October 31, 2019, SA George and ATF SA Cook conducted an interview with a Source of Information (SOI #2).   At that time, SOI #2 identified a black male from Las Vegas, Nevada from whom she obtains methamphetamine.   SOI #2 stated that he/she refers to the black male as "D."   It should be noted that 'D' is believed to be Edward MARTIN and will be referred to as MARTIN.   SOI #2 stated that he/she receives methamphetamine from MARTIN and MARTIN commonly socialized at the Jackpot II Casino or Toby's Casino in Rapid City.   SOI #2 stated that approximately two (2) days prior to the interview with SA Cook and SA George, MARTIN contacted SOI #2 and advised that MARTIN would be in Pine Ridge, SD and was believed to be distributing methamphetamine.

49.  SOI #2 stated that he/she meets MARTIN at the Econo-Lodge, room #223, located at 625 E. Disk Drive, Rapid City, SD, which is where MARTIN is staying.   SOI #2 stated that she/he has not observed MARTIN in possession of methamphetamine, with the exception of the methamphetamine obtained by SOI #2 from MARTIN.   SOI #2 stated that MARTIN would provide SOI #2 with methamphetamine and would request sex in exchange.   SOI #2 did advise that she/he and MARTIN are in a sexual relationship.   SOI #2 stated that MARTIN associates with a Native-American female with long hair, believed to be SKINNER.   SOI #2 has observed MARTIN and the Native-American female together at casinos.

50.  On November 4, 2019, Detective Bloomenrader and SA George met with CI #19-1576.   At that time, the CI advised that shortly after being released from jail, the CI made contact with SKINNER, who paid for the CI's room at a local motel.   The CI stated that he/she and SKINNER travelled to a storage unit located at 2000 Seger Drive, unit #74, Rapid City, SD.   The CI stated that the storage unit is to the west of

the storage unit complex previously identified by the CI. The CI stated that SKINNER retrieved multiple ounces of methamphetamine from the storage unit. The CI stated that SKINNER was travelling in a red Ford Escape. On this date, the CI advised that SKINNER was staying in the Ramada Inn, room #224 located at 1902 North Lacrosse Street, Rapid City, SD. The CI stated that MARTIN was staying at the Econo-Lodge located at 6215 East Disk Drive, Rapid City, SD. On this date, the CI informed Detective Bloomenrader that MARTIN and/or SKINNER would be receiving a package containing methamphetamine on November 5, 2019. The CI believed the package containing methamphetamine was getting shipped to Rapid City from Las Vegas, NV; however, the CI was not aware of the carrier (FedEx, UPS, USPS, etc.).

51. On November 5, 2019, law enforcement assisting with the investigation established surveillance at pre-determined locations relevant to the investigation. SKINNER's vehicle, the red Ford Escape bearing South Dakota license plate number 2V7098 was located at the Ramada Inn referenced above. Law enforcement observed a female, believed to be SKINNER, exit the hotel and enter the Ford Escape. Law enforcement observed SKINNER travel to the Econo-Lodge. Shortly thereafter, the vehicle departed the Econo-Lodge and an individual, believed to be MARTIN, was seated in the front passenger seat of the vehicle.

52. The vehicle travelled to UPS located at 1430 Haines Avenue, Rapid City, SD. The vehicle parked in front of the store for a short amount of time. After the vehicle departed the area, RCPD Detective Trevor Tollman made contact with the staff at UPS. Detective Tollman displayed a digital photograph of MARTIN, which the UPS staff positively identified as MARTIN and indicated just shipped a package from the store. The UPS staff retrieved the package and a parcel shipping order for the shipment.

53. It was determined that MARTIN is a frequent customer at the UPS store. MARTIN often ships parcels to 'Christopher James' at 6500 West Charleston Road, #128, Las Vegas, NV. It was also learned that MARTIN recently entered the UPS store with a pre-sealed padded envelope, approximately 8" x 12" in size. MARTIN informed the UPS employee that the packaged contained clothing with a declared value of $60.00. MARTIN also indicated the package was going to his son, which led the employee to believe JAMES was MARTIN's son. MARTIN paid $96.59 cash to ship the

package with a guaranteed delivery of November 6, 2019 by 10:30am. MARTIN did not add insurance to the package, as the UPS store insures packages with a declared value of up to $100.00. The employee indicated MARTIN normally pays for three (3) to five (5) day ground shipping, and this was the only time they knew of MARTIN paying for guaranteed next day delivery. This particular package would have cost MARTIN approximately $13.99 to ship if MARTIN chosen the three (3) to five (5) day delivery.

54. On November 5, 2019, DCI SA George met with the management of Rapid City Self Storage, who own/manage several self-storage facilities in the Rapid City area. Rapid City Self Storage management provided SA George with a list of tenants for all the storage units that Rapid City Self Storage manages. After reviewing the tenant list, SKINNER is identified as the tenant of the storage unit located at 2000 Seger Drive, unit #S74 and the storage unit located at 2280 Seger Drive, unit #S281.

55. On November 6, 2019, Detective Bloomenrader and DCI SA George met with CI #19-1576. At that time, the CI stated that in the evening hours of November 5, 2019, the CI was with MARTIN and SKINNER at the Ramada Inn, room #224. The CI stated that Kateri PATTON was also in the hotel room. The CI stated that PATTON traded MARTIN at least one (1) firearm in exchange for methamphetamine. The CI stated that MARTIN also brandished a military style rifle, which was being stored under the bed. The CI stated the rifle had a scope and the ammunition for the rifle was being stored in a sock. The CI overheard MARTIN and SKINNER discussing taking the firearm to the storage unit located at 2000 Seger Drive, unit #74, Rapid City. The CI further overheard MARTIN and SKINNER discussing getting the firearms to California. The CI stated that multiple individuals arrived at SKINNER's hotel room in order to purchase methamphetamine.

56. On November 7, 2019, after reviewing the information from Rapid City Self Storage, an Electronic Video Surveillance Unit (EVSU) was setup to observe the area of the storage units located at 2000 Seger Drive, Rapid City, SD. The EVSU was moved on November 15, 2019 in order to obtain a better view of storage unit #74.

57. After reviewing video of the storage unit located at 2000 Seger Drive, Unit #74, SA George observed a red Ford SUV occupied by a black male, believed to be MARTIN, and a Native American female, believed to be SKINNER, frequent the storage

unit on multiple occasions.  For a majority of the incidents, the individual believed to be MARTIN enters the storage unit and exits a short amount of time later.  Nothing can be observed being taken to or away from the storage unit via the EVSU.

58. On November 7, 2019, SA George spoke with management at the UPS stores in Rapid City, SD.  SA George was advised that MARTIN is a frequent customer and began shipping packages from the Rapid City area UPS stores in July, 2019.  UPS provided SA George with a list of all packages MARTIN has shipped, which have been identified as the following:

- 7-8-19: A carrier letter to Jonathan Belaphontay in San Bernardino, CA, weighing 13.7oz. Description of contents: Legal Docs and sent next day air for $72.41.
- 7-8-19: A carrier letter to Jesse Stewart in Cary, NC, weighing 4.7oz. Description of contents: Pictures & Card and sent next day air for $42.96.
- 7-16-19: A package to Elise Martin in Las Vegas, NV, weighing 2lbs 4.8oz. Description of contents: Clothes and sent UPS ground for $14.92.
- 7-30-19: A carrier letter to Sasha Cook in Concord, NC weighing 1lbs 12.9oz. Description of contents: Books and baby pictures and sent next day air for $78.73.
- 8-2-19: A package to ALC in Miami, FL, weighing 7.2oz. Description of contents: Cell phone and sent UPS ground for $11.86.
- 8-13-19: A package to Sarah Velvick in Las Vegas, NV, weighing 6lbs 15.9oz. Description of contents: Clothes and sent UPS ground for $21.35.
- 8-19-19: A carrier letter to Christopher James in Las Vegas, NV, weighing 1lbs 6.0oz. Description of contents: DOCS and sent next day air for $76.87.
- 8-19-19: A package to Christopher James in Las Vegas, NV, weighing 5lbs 11.3oz. Description of contents: Clothing, Shoes and sent next day air for $125.28.
- 9-26-19: A package to Sasha Cook in Concord, NC, weighing 11.9oz. Description of contents: DOCS and sent next day air for $103.53.
- 10-4-19: A package to Christopher James in Las Vegas, NV, weighing 11.8oz. Description of contents: DOCUMENTS and sent next day air for $123.49.
- 10-9-19: A carrier letter to Jerry Cleveland in San Bernardino, CA, weighing 9.2oz. Description of contents: Card, Necklace and sent next day air for $72.41.
- 10-21-19: A carrier letter to Christopher James in Las Vegas, NV, weighing 12.4oz. Description of contents: DOCS and sent next day air for $104.41.
- 11-5-19: A package to Christopher James in Las Vegas, NV, weighing 5lbs. Description of contents: CLOTHING and sent next day air for $96.59.

- 11-27-19: A carrier letter to Sasha Cook in Concord, NC, weighing 1.7oz. Description of contents: LETTER and sent next day air for $41.44.

59. On November 8, 2019, CI #19-1576 advised law enforcement that he/she was able to purchase methamphetamine from SKINNER. It was determined that the CI would travel to SKINNER's hotel room located at the Ramada Inn, room #224. When the CI arrived, MARTIN and SKINNER were located in the hotel room. The CI and SKINNER exchanged the prearranged methamphetamine for documented agent cashier funds. While in the hotel room, the CI stated that MARTIN and SKINNER were discussing possible parcels being shipped.

60. On November 12, 2019, CI #19-1576 advised law enforcement that he/she was able to purchase methamphetamine from SKINNER. Again, the CI was instructed by SKINNER to travel to the Ramada Inn, room #224. When the CI arrived at the Ramada Inn, the CI made contact with SKINNER. The CI provided SKINNER with documented agent cashier funds in exchange for methamphetamine. In addition, the CI discussed with SKINNER the cost of one (1) pound of methamphetamine. SKINNER stated that would need to be discussed with MARTIN.

61. On November 20, 2019, law enforcement were conducting a controlled purchase operation regarding a separate investigation in Rapid City, SD. During the controlled purchase operation, the CI was notified that the methamphetamine would arrive at the controlled purchase location in approximately one (1) hour. Ultimately, a red Ford Escape bearing South Dakota license plate number 2V7098 arrived near the location of the controlled purchase operation. Law enforcement observed three (3) individuals inside the vehicle. MARTIN and SKINNER were positively identified by law enforcement to be in the vehicle. The other individual was an unknown Native American male. Shortly after arrival, the Native American male exited the vehicle and approached the controlled purchase location. The CI then received a clear plastic baggie containing one (1) ounce of suspected methamphetamine, which was provided to law enforcement.

62. On November 27, 2019, the Pennington County Sheriff's Office (PCSO) made contact with the occupants of a vehicle following a driving complaint. The vehicle was

found parked at the residence located at 723 Myrtle Avenue, Apartment #1, Rapid City, SD, which is the residence of Keeler STANDS.  Law enforcement knocked on the door of the residence and made contact with Veronica Jeffords.  When Jeffords opened the door to the residence, law enforcement detected the odor of marijuana emulating from inside the residence.  Shortly thereafter, law enforcement made contact with Jefford's mother, Betty, who admitted to driving the vehicle at the time of the driving complaint. Betty provided to law enforcement that she has been taking care of Jefford's child for the past six (6) months due to Jefford's drug use.

63.  While speaking with Betty, STANDS and Jeffords exited the residence located at 723 Myrtle Avenue, Apartment #1, Rapid City, SD.  STANDS informed law enforcement that the above identified address was STANDS' primary residence.  Law enforcement informed STANDS that the odor of marijuana was detected coming from STANDS' residence each time the door was opened.  STANDS stated that the neighbors often smoke marijuana at the odor was coming from a separate residence; however, it was later learned by law enforcement that the neighboring apartment was vacant as the neighbors recently moved out.  STANDS denied the presence of marijuana or methamphetamine in the residence.

64.  On December 4, 2019, CI #19-1576 informed law enforcement that SKINNER and MARTIN were discussing moving to an apartment and may have put a deposit down for a permanent residence.  The location of the residence was not known to the CI at that time.

65.  On December 7, 2019, SA George observed SKINNER and an unknown male, via the EVSU, arrive at the storage unit located at 2000 Seger Drive, unit #73, Rapid City, SD.   SKINNER and the unknown male loaded multiple items into SKINNER's vehicle identified as the red Ford Escape bearing South Dakota license plate number 2V7098.  After loading multiple items into the vehicle, SKINNER and the unknown male travelled to the Jackpot Casino and then to a residence located at 706 Taylor Avenue, Apartment # 2 Rapid City, SD 57701.  ATF SA Cook and DCI SA George conducted surveillance of the residence.  At that time, SKINNER's vehicle was observed parked at the residence.  SKINNER and the unknown male were observed unloading items from the vehicle and placing the items within the residence.  Cleaning supplies

and a vacuum was also observed.    It appeared as though SKINNER was moving into the residence.

66. Beginning on December 7, 2019 and continuing until present, through the use of physical surveillance and electronic monitoring devices, SKINNER has been commonly frequenting the residence at 706 Taylor Avenue, Apartment #2, Rapid City, SD 57701. Based on the time of the day and frequency of activity at the above identified residence, it is believed that SKINNER does reside at the residence. SKINNER is also often observed travelling from the above identified residence to the Econo-Lodge located at 625 East Disk Drive, Rapid City, SD 57701, which is where MARTIN is currently residing. Vehicles registered to unknown individuals have also been observed at the residence for short periods of time.

67. On December 11, 2019, DCI SA BJ George obtained a guest list and room assignment for the Econo-Lodge hotel located at 625 East Disk Drive, Rapid City, SD 57701. It was determined that MARTIN is currently staying in room number 326 at the above identified hotel. MARTIN has a scheduled check-out date of December 12, 2019.

68. On December 11, 2019, SA George contacted Rapid City Self Storage and requested information regarding the storage units belonging to Sara SKINNER. At that time, SA George was advised that SKINNER's monthly rent was currently due for the storage units located at 2280 Seger Drive, Unit #281 and 2000 Seger Drive, Unit #74, Rapid City, SD 57701. SA George was further advised that Rapid City Self Storage management contacted SKINNER who advised that she wished to maintain possession of both storage units and would pay the monthly rent. Further, SKINNER provided an updated mailing address of 706 Taylor Avenue, Apartment #2, Rapid City, SD 57701.

69. On December 11, 2019, a federal search warrant was executed at storage units #74 and #281. In unit #74, law enforcement recovered a black bag with approximately 9 ounces of suspected methamphetamine, a digital scale, and other miscellaneous drug paraphernalia. In unit #281, law enforcement recovered receipts for money orders.

70. On December 11, 2019, a federal search warrant was executed at the Econo-Lodge located at 625 E. Disk Drive, Room 326, Rapid City, SD 57701.

During the execution of the search warrant, Jesse Stewart was located in the hotel room referenced above. Stewart's cell phone was recovered from his hand. Stewart was identified by his Nevada Driver's License. Stewart had a hotel key card in his pocket for Room 326.  Pursuant to the search of the hotel room, law enforcement located approximately $5066.00 in U.S. currency, rubber banded into several bundles, on Stewart's person. Also located in the hotel room was approximately eight (8) ounces of suspected methamphetamine, a digital scale, plastic sandwich bags, a Ruger, 9mm semi-automatic pistol, and several money gram receipts.  It was further identified that Stewart was in possession of a rental vehicle, which was towed pending a search warrant.  A search of Stewart in a local law enforcement database shows an address of 3213 West Main Street, Rapid City, SD 57702, which has been identified as a UPS store.  Stewart was arrested on state charges and placed in custody at the Pennington County Jail.

71.  Law enforcement also located airline documents for Stewart indicating he had arrived in Rapid City on December 6, 2019, and was scheduled to leave on December 30, 2019.  Law enforcement found paperwork for Fox Den Store-It storage unit #832 indicating Martin rented the unit beginning October 28, 2019.  On the lease agreement subsequently obtained by law enforcement, "Keith Giddens" was listed as the person to notify in the event of a default by Martin.  A subsequent search of that storage unit #832 on December 12, 2019, revealed an assault rifle with a scope and ammunition.

72.  On December 12, 2019, SA George was listening to jail phone calls being made by Stewart.  He called someone whom he addressed as "Sasha." The phone number being used by Sasha was identified as belonging to Sasha Cook.  It has been identified that MARTIN shipped packages addressed to Sasha COOK in North Carolina.  The packages were shipped to a UPS store in Concord, North Carolina.  MARTIN shipped packages to COOK on July 30, 2019; September 26, 2019; and November 27, 2019.  COOK's current address has not been identified in Rapid City; however, it is believed that COOK may reside near 3621 West Chicago Street. Keeler STANDS previously identified this approximate location to law enforcement

when he drove Martin to Cook's address to pick up a package containing methamphetamine in September 2019.

73.  On December 11, 2019, a federal search warrant was executed at 706 Taylor Avenue, #2, Rapid City, SD.  Law enforcement recovered a cellular phone from Sara Skinner. During the search they also seized a bag of suspected methamphetamine and drug paraphernalia.

74.  On December 12, 2019, with the assistance of the United States Postal Inspection Service (USPIS), members of UNET, ATF, and the Rapid City POD were able to intercept the parcel destined for "Grandma Mary Decatur" at 706 Taylor Avenue, Apartment 2, in Rapid City, South Dakota. Members of the investigative subsequently applied for and were granted a federal search warrant to open the parcel addressed to "Grandma Mary Decatur". Upon executing the search warrant, members of the investigative team located approximately one (1) pound of crystal methamphetamine that had been concealed within a teddy bear.

75.  On December 12, 2019, an unknown female, who was utilizing telephone number (702) 776-0137, contacted the United State Postal Service in Rapid City, South Dakota, and attempted to reroute the parcel from Rapid City to an address in Las Vegas, Nevada. As the female was attempting to redirect the parcel, the female advised that the recipient of the parcel, "Grandma Mary Decatur", had traveled to Las Vegas, Nevada, and it needed to be returned. The female subsequently provided postal staff with an address of 6500 W. Charleston Boulevard, Apartment 128, Las Vegas, Nevada, and identified herself as Brandi Mercado.

76.  According to the USPIS, various cellular phones and mobile devices were used to track parcels destined for persons in Rapid City. In my training and experience, the web search history of the SUBJECT DEVICES may reveal whether these devices were used to track shipped parcels.

77.  On January 28, 2020, a state search warrant was executed at 6500 W. Charleston Blvd., Apt. #128, Las Vegas, NV.  Present at the home was Christopher James, Kirbesha Bailey, Brandi Cozo, Keith Gidden, and Bailey's juvenile son.  Law enforcement seized cellular phones from Kirbesha Bailey, Christopher James, and

Bailey's juvenile son.  Law enforcement obtained consent to search the juvenile's phone and observed content consistent with an adult using the phone.

78.  In my training and experience, the Subject Devices will have information on their cellular phones about their activities, movement and contacts.

79.  Based on a review of criminal histories, the following persons have felony convictions: Stewart, Martin, Skinner, Olson, Giddens, James, and McGuire.

### Modus Operandi of Drug & Firearm Traffickers

80. During my tenure in law enforcement, I have been involved in numerous investigations of narcotic trafficking organizations involving the distribution of firearms and controlled substances as well as related activities.  I have interviewed drug users and dealers regarding the manner in which they operate and have become familiar with their techniques.   I have executed search warrants for vehicles, residence, hotel rooms, as well as search warrants for devices, records, ledgers, social media accounts and documentation reflecting the sale of controlled substances.

81.  Based upon my training and experience, including my direct experience in this investigation, I have developed knowledge regarding practices commonly used by drug traffickers and their organizations, including:

A. Drug traffickers often maintain, on hand, large amounts of cash (typically U.S. currency) in order to finance their drug distribution activities;

B. It is common for drug traffickers to secrete contraband (including controlled substances), proceeds of drug sales, and records of drug transactions in secure locations within their residences, business, in lock boxes/safes and vehicles to conceal them from law enforcement.

C. Drug traffickers commonly maintain addresses or telephone numbers in books, documents and electronic devices that have memory which include computer hard drives, cellular phones, Global Positioning Systems which reflect names, addresses and telephone numbers of the associates in the trafficking organization.

D. I also know that individuals involved in the distribution of controlled substances and their associates correspond and communicate using internet, social media, email, cellular phone text messages and that their computers

and/or other electronic storage media in their possession may be used to prepare, create, and maintain writings, records, and documents relating to their activities and associations, including but not limited to the trafficking of controlled substances.

E. Through my own experience and training, I am aware that it is common for narcotics traffickers to utilize cellular telephones to facilitate their drug trafficking activities. I am also aware that, in addition to using the telephones for communication purposes, said traffickers may also use the internal memory (such as "phone book" or "notes" functions) of the telephone to store names, identifying information, and contact telephone numbers of individuals involved in said drug-trafficking enterprises, and that certain models of cellular telephone also maintain limited logs of past calls made by that telephone.

F. I am also aware that more people, including drug traffickers, are utilizing "Smart" phones, such as Apple iPhones, and GPS units for travel directions. These GPS units can be standalone devices manufactured for that single purpose or applications used through cellular phones. Many of the "Smart" phones and GPS units are programmed with addresses from around the United States and all a user has to do is enter the address he/she wants to travel to and the "Smart" phones and GPS units will provide a travel route for the user. Besides providing a travel route for the user most of the "Smart phones" and GPS units also automatically keep track of the route the user has taken and will back track the route to the point of origin. I am aware that Facebook users' locations can be determined by data kept by Facebook, Inc.

G. Drug traffickers take or cause to be taken photographs and videos of themselves, their associates, their assets, their travels, and their product. That these traffickers usually maintain these photographs and videos in their possession, or within their residences, computers, cellular phones, vehicles, and/or other locations over which they maintain dominion and control, including on their social media accounts such as Facebook.

H. It is generally a common practice for drug traffickers to maintain in their residences and/or other locations over which they maintain dominion and control records relating to their drug trafficking activities.  Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep "pay and owe" records (drug ledgers) to show balances due for drugs sold in the past ("pay"), and for payments expected ("owe") as to the trafficker's supplier and the trafficker's dealer(s).  Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers, and keep them immediately available in order to efficiently conduct their drug trafficking business. Such records can be maintained on paper, cellular phones, or other devices, as well as in portions of social media accounts, such as Facebook.

I. It is a generally common practice for drug traffickers to make use of wire transfers, cashier's checks, and money orders to pay for expenses associated with services to facilitate their illegal activities.  Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in a trafficker's residence and/or other locations over which they maintain dominion and control, including cellular phones.

J. Drug dealers keep paraphernalia for packaging, weighing, using and distributing controlled substances and the paraphernalia include, but are not limited to, scales, plastic bags, aluminum foil, paper bindles, zip lock bags and other containers commonly used to package and store controlled substances.

K. Drug distributors frequently trade illegal drugs for stolen property and firearms.

L. Drug distributors frequently possess firearms in the furtherance of their drug activities, such as intimidation or threats, or for protection.

## TECHNICAL TERMS

82. Based on my training and experience, I use the term wireless telephone to convey the following meaning: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

83. Based on my training, experience, and research I know the cellular phones described in Attachment A have capabilities that allow them to serve as a wireless telephone, as well as possibly a digital camera with photographs and video, and a portable media player of video and music. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the Subject Devices.

84. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. This information can sometimes be recovered with forensic tools.

85. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence

that establishes how each of the SUBJECT DEVICES was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the SUBJECT DEVICES because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   d. The process of identifying the exact electronically stored information on storage medium that are necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

   e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

86.     *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Subject Devices consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium,

that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

87.     *Manner of execution.*  Because this warrant seeks only permission to examine Subject Devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## REQUEST/JUSTIFICATION ORDER TO SEAL

88.     I request an order sealing this case until further order of the Court, in that this search is being conducted as part of an ongoing federal criminal investigation and contains information from persons cooperating with law enforcement. Disclosure of information contained in the affidavit and attachments filed with the Court could seriously jeopardize the safety of cooperating persons and his ongoing investigation.

## CONCLUSION

89.     I submit that based on the facts set forth in this affidavit, there is probable cause to believe the Subject Devices described in Attachment A contains evidence, fruits, and or instrumentalities of violations of 18 U.S.C. § 922(g) and 21 U.S.C. §§ 841(a)(1) and 846. Therefore, I request permission to search the Subject Devices in Attachment A for the evidence, fruits, and instrumentalities identified with particularity in Attachment B. Based on the foregoing, I request that the Court issue the proposed search warrant.

BJ George, Special Agent
SD Division of Criminal Investigation

Sworn to before me and:  ☐ signed in my presence.
                         ☒ submitted, attested to, and acknowledged by reliable electronic means.

this 1st day of ~~March~~ April, 2020

Daneta Wollmann
United States Magistrate Judge

30

# UNITED STATES DISTRICT COURT

for the
District of South Dakota

In the Matter of the Search of )
)
Seven Cellular Phones, as described in ) Case No. 5:20-mj-74
Attachment A. )
)
)
)

## SEARCH AND SEIZURE WARRANT

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the District of ___South Dakota___ *(identify the person or describe the property to be searched and give its location)*:

Seven Cellular Phones, as described in **ATTACHMENT A**, which is attached to and incorporated in this Application and Affidavit

I find that the affidavit, or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

Evidence of a crime(s) in violation of 18 U.S.C. § 922(g) and 21 U.S.C. §§ 846 and 841(a)(1), as described in **ATTACHMENT B**, attached hereto and incorporated by reference.

I find that the affidavit, or any recorded testimony, establishes probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before ___April 15, 2020___ *(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10 p.m.    ☒ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to ___Daneta Wollmann___.
*(United States Magistrate Judge)*

Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30).*    ☐ until, the facts justifying, the later specific date of _____.

Date and time issued: ___4/1/2020___

_____
*Judge's signature*

City and state: ___Rapid City, SD___

___Daneta Wollmann, U.S. Magistrate___
*Printed name and title*

cc: AUSA Rich
clr

AO 93 (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>5:20-mj- 74 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

2